# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF MISSISSIPPI
### JACKSON DIVISIONAL OFFICE

IN RE:  ROBIN T. LEACH AKA ROBIN THORNTON        CASE NO. 11-00427-NPO-7

---

**AGREED ORDER GRANTING VANDERBILT MORTGAGE AND FINANCE, INC.'S MOTION FOR RELIEF FROM THE AUTOMATIC STAY AND FOR ABANDONMENT OF PROPERTY FROM DEBTOR'S ESTATE (DKT. # 11)**

---

On consideration before the Court is the motion of Vanderbilt Mortgage and Finance, Inc. ("Vanderbilt") for relief from the automatic stay now protecting the interests of the Debtor, Robin T. Leach aka Robin Thornton ("Debtor"), in certain personalty and realty and for abandonment of same from the Debtor's Estate ("Motion for Relief") (Dkt. # 11); the parties hereto having reached a compromise and settlement of their respective positions, the Court hereby finds same to be well taken and further finds and adjudicates as follows, to-wit:

1.  This Court has jurisdiction over the subject matter herein and the parties hereto pursuant to 28 U.S.C. § 1334, 11 U.S.C. § 362 and 11 U.S.C. §554, along with other related statutes and rules. This is a core proceeding as defined by 28 U.S.C. §157(b)(2)(A) and (G).

2.  On or about June 16, 2008, the Debtor executed a Manufactured Home Promissory Note, Security Agreement and Disclosure Statement ("Note") in the amount of $71,610.61 for the benefit of Vanderbilt. To secure this indebtedness, the Debtor granted Vanderbilt a valid first perfected security interest in one (1) 2007 CMH Model 37L manufactured home bearing Vehicle Identification Number CV2008958TNAB ("manufactured home"). To further secure this indebtedness, the Debtor and Willie Leach executed a Deed of Trust and Manufactured Home Rider to Security Instrument ("Rider") granting Vanderbilt a valid first perfected lien interest in certain real property located in Leake County, Mississippi. Copies of the Note, Deed of Trust, Rider and related legal description and

State of Mississippi Certificate of Title evidencing Vanderbilt's lien on the manufactured

home and real estate are attached to the Motion for Relief as part of collective Exhibit

"1."

3.      On February 8, 2011 ("petition date"), the Debtor filed her voluntary petition for relief

pursuant to Chapter 7, Title 11 of the *United States Code*. Subsequent thereto, Eileen N.

Shaffer was appointed Chapter 7 Trustee. Along with her petition, the Debtor filed a

Chapter 7 Individual Debtor's Statement of Intention ("Statement of Intention"), which

proposes, *inter alia*, for the Debtor to surrender her interest in the manufactured home

and real property. A copy of the Debtor's Statement of Intention is attached to the Mo-

tion for Relief as part of collective Exhibit "1."

4.      As of March 23, 2011, the Debtor agrees she was in arrears under the Note and Deed of

Trust in the aggregate amount of $6,302.96, representing past due monthly payments un-

der same for the months of June and July 2010 (P&I 542.62 + Escrow $101.38 =

$644.00), and August 2010 through March 2011 (P&I 542.62 + Escrow $84.25 =

$626.87). The parties hereto further agree that the combined value of the manufactured

home and realty as of the Debtor's petition date, $48,300.00 (approximately $39,300.00

for the manufactured home according to the NADA Manufactured Housing Appraisal

guide and approximately $9,000 for the realty based on pre-petition appraisal), is less

than the balance of $78,238.92 due Vanderbilt as of March 2, 2011.

5.      The Parties hereto agree and the Court finds that the indebtedness due Vanderbilt exceeds

the value of the manufactured home and real estate and, as such, there is no equity in the

manufactured home and real estate as contemplated by 11 U.S.C. §362(d)(2)(A). Fur-

ther, since the Debtor has filed a Chapter 7 liquidation and proposed, through her State-

ment of Intention, to surrender the manufactured home and realty, same is not necessary to her effective reorganization as contemplated by 11 U.S.C. §362(d)(2)(B).

6.    Accordingly, the automatic stay, as contemplated by 11, U.S.C. §362, now protecting the Debtor's interest in the manufactured home and realty is hereby lifted and the manufactured home and realty are hereby abandoned from the Debtor's estate pursuant to 11 U.S.C. §554.

7.    Upon the disposition of the manufactured home and realty, Vanderbilt shall report any surplus to the Trustee and have the ability to file an unsecured claim a deficiency balance remain after liquidation of the manufactured home and realty.  In addition, any claims filed by Vanderbilt in this case are hereby reduced to the amounts already paid and withdrawn.

8.    The provisions of Rule 4001(a)(3) of the Bankruptcy Code are hereby waived and Vanderbilt is entitled to immediately foreclose/repossess its collateral pursuant to applicable state and/or federal law.

9.    This Agreed Order shall survive the conversion or dismissal of this case.

SO ORDERED AND ADJUDGED.

_Neil P. Olack_
Neil P. Olack
United States Bankruptcy Judge
Dated:  April 5, 2011

Approved as to Content and Form:

_James P. Wilson_
James P. Wilson, Jr.
Post Office Box 1366
Columbus, MS 39701-1366
*Attorney for Vanderbilt Mortgage and Finance, Inc.*

678410

_Jim Arnold w/ permission by JPW_

Jim Arnold
333 East Mulberry Street
Durant, MS 39063
*Attorney for Debtor*


Eileen N. Shaffer
*Chapter 7 Trustee*


ORDER PREPARED AND PRESENTED BY:

/s/ James P. Wilson, Jr. (MSB# 10783)
Mitchell, McNutt & Sams
Post Office Box 1366
Columbus, Mississippi 39703-1366
Telephone: 662.328.2316
jwilson@mitchellmcnutt.com

678410

_____
Jim Arnold
333 East Mulberry Street
Durant, MS 39063
*Attorney for Debtor*


_____
Eileen N. Shaffer
*Chapter 7 Trustee*


ORDER PREPARED AND PRESENTED BY:

/s/ James P. Wilson, Jr. (MSB# 10783)
Mitchell, McNutt & Sams
Post Office Box 1366
Columbus, Mississippi 39703-1366
Telephone: 662.328.2316
jwilson@mitchellmcnutt.com

678410

Date **6/16/08**  

MANUFACTURED HOME PROMISSORY NOTE, SECURITY AGREEMENT AND DISCLOSURE STATEMENT      CONV ☒ FHA ☐ VA ☐

| ASSIGNEE: Vanderbilt Mortgage and Finance, Inc. | Post Office Box 9800 | Maryville, | TN | 37802 |

Buyer's Name:   **ROBIN T LEACH**   Co-Signer's Name:
Buyer's Name:   Co-Signer's Name:
Buyer's Address:   **606 NORTH ST , SEBASTOPOL , MS 39359**

"Buyer" refers to all persons who sign this contract as buyer or co-buyer, jointly and severally. "Seller" refers to the seller. The Seller will submit this contract to Vanderbilt Mortgage and Finance, Inc., P.O. Box 9800, Maryville, Tennessee 37802; and, if approved, the contract will be assigned to Vanderbilt Mortgage and Finance, Inc. Buyer promises to advise Seller in writing of any change of Buyer's mailing address while this contract is in effect. Seller should send any papers or notices concerning the Manufactured Home purchased under this contract to Buyer's mailing address. On the date of this contract, Buyer buys from Seller on a credit sale basis the Manufactured Home described below, together with furnishings, equipment, appliances and accessories included in the Manufactured Home at the time of purchase (collectively called "Manufactured Home").

**PROMISE TO PAY:** Buyer promises to pay Seller the "Unpaid Balance" as listed under "Itemization of Amount Financed" below plus interest from the contract date at the rate of 8.25 % ("Contract Rate"). The "Unpaid Balance" includes any Prepaid Finance Charges advanced for Buyer. Prepaid Finance Charges, if any, shall be deemed fully earned by Seller when Buyer executes this Note. Buyer will pay the loan by making monthly payments in the amount(s) and on the dates listed in the Payment Schedule shown below. Buyer understands that the amount of the regular payment is based upon the assumption that all payments will be made on the scheduled due dates and in the scheduled amounts. If no Contract Rate is disclosed above, the initial interest rate is the Annual Percentage Rate shown below. The finance charge is figured on the assumption that Buyer will make each payment exactly as scheduled. (Buyers payment schedule).

**Description of Manufactured Home**   New ☒ Used ☐

| TRADE NAME: CMH | ADDITIONAL ACCESSORIES AND FURNISHINGS: ITEM AND SERIAL # | |
|---|---|---|
| MODEL: LAKESHORE | Nordyne Furnace | E3E070803588 |
| | GE Stove | MM178199P |
| SERIAL NO: CS2008958TNAB | GE Refrigerator | RM528373 |
| SERIAL NO: | GE Dishwasher | SM703247B |

| ANNUAL PERCENTAGE RATE: The cost of Buyer's credit as a yearly rate. | FINANCE CHARGE: The dollar amount the credit will cost Buyer. | Amount Financed The amount of credit provided to Buyer or on Buyer's behalf: | Total of Payments The amount Buyer will have paid after Buyer has made all payments as scheduled: | Total Sale Price The total cost of Buyer's purchase on credit including Buyer's down payment of $4,000.00 |
|---|---|---|---|---|
| 8.34 % | $123,732.59 | $71,610.61 | $195,343.20 | $199,343.20 |

Buyer's payment schedule will be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 360 | $542.62 | Monthly, beginning 8/01/2008 |
| | | Monthly, beginning |
| | | Monthly, beginning |
| | | Monthly, beginning |

**Security:** Buyer gives Seller a security interest in:
☒ The goods or property being purchased including the Manufactured Home as described above.
☒ Real property located at: PURVIS ROAD (S23 T9N R9E) SEBASTOPOL MS39359
**Late Charge:** If a payment is more than 15 days late, Buyer will be charged 5% of the unpaid amount of such payment, not to exceed $5.00.
**Rebate for Prepayment :** At any time, Buyer has the right without penalty to pay this contract in full or to pay more than Buyers schedule requires. Buyer earns the Prepaid Finance Charge when Buyer receives the Home and no part of it will be refunded if Buyer pays in full ahead of schedule.
**Assumption:** Someone buying the Manufactured Home may be allowed to assume the remainder of Buyer's obligations under this contract on the original terms only if such person is approved by Seller.
See "Additional Terms and Conditions" on reverse side for additional information about nonpayment, default, required payment in full before the scheduled date and prepayment refunds and penalties.

Page 1 (10/00)

RTL



EXHIBIT
1

| ITEMIZATION OF AMOUNT FINANCED: | | | INSURANCE: |
|---|---|---|---|

**ITEMIZATION OF AMOUNT FINANCED:**

| | | |
|---|---|---|
| 1. Cash Price (Including Sales Tax of $2,333.61) .... | | $66,045.61 |
| Cash Downpayment........... $4,000.00 | | |
| Trade-in (Year, Make, Model) N/A | | |
| Length N/A    Width N/A | | |
| Trade Allowance N/A    Liens N/A | | |
| Net Trade-in Allowance    N/A | | |
| 2. Total Downpayment ................................. | | $4,000.00 |
| 3. Unpaid Balance of Cash Price (1 minus 2) .... | | $62,045.61 |
| 4. Amounts paid to others on Buyer's behalf | | |
| a. To Insurance Companies | | |
| (1) Property Insurance .... | $1,180.00** | |
| (2) Credit Life Insurance ............... | $.00 ** | |
| b. To Public Officials | | |
| (1) Certificate of Title ................... | $38.00 | |
| (2) Filing Fees ............................ | $31.00 | |
| c. To LAND PAYOFF ..................... | $7,500.00** | |
| d. To ............................................ | $.00** | |
| e. To ............................................ | $.00** | |
| f. To ............................................ | $.00** | |
| g. To APPRAISAL FEE ................. | $350.00** | |
| h. To ............................................ | $.00** | |
| i. To TITLE SEARCH ..................... | $250.00** | |
| j. To ............................................ | $.00** | |
| k. To ............................................ | $.00** | |
| l. To ............................................ | $.00** | |
| m. To ATTORNEY FEE ................... | $617.00** | |
| n. To TITLE INSURANCE ............... | $216.00** | |
| Total (items a. through n.) ................. | $10,182.00 | |
| 5. Unpaid Balance (3 plus 4) ..................... | | $72,227.61 |
| 6. Prepaid Finance Charges to VMF ................. | | $617.00 |
| 7. Amount Financed (5 minus 6) ..................... | | $71,610.61 |
| **Seller may retain, or receive, a portion of these amounts | | |

**INSURANCE:**

**PROPERTY INSURANCE ON THE MANUFACTURED HOME IS REQUIRED FOR THE TERM OF THIS CONTRACT. BUYER HAS THE RIGHT TO OBTAIN SUCH INSURANCE FROM ANYONE AUTHORIZED BY LAW TO SELL IT.**

However, by checking the appropriate box below, Buyer elects to buy through Seller property insurance of the specified coverage, term and premium.

| Type of Insurance | Term | Premium |
|---|---|---|
| [X] MobilOwners | 12 | $1,180.00 |
| [ ] | | |

**OPTIONAL HOME BUYER PROTECTION PLAN (HBPP):** Buyer protection and service plans are voluntary and are not required to obtain credit. If the box is checked, Buyer has elected to purchase HBPP at the terms shown below.

| Type of Insurance | Term | Premium |
|---|---|---|
| [ ] | | |

**CREDIT LIFE INSURANCE IS NOT REQUIRED TO OBTAIN CREDIT AND WILL NOT BE PROVIDED UNLESS BUYER SIGNS AND AGREES TO PAY THE ADDITIONAL COST.**

| Type of Coverage | Term | Premium |
|---|---|---|
| [ ] | | |

This insurance may not pay off all Buyer's debt and the exact amount of coverage is shown on Buyer's policy or certificate. If Buyer elects credit insurance, the name(s) of the proposed insured(s) are:
(Only One Buyer (not Co-Signer) may be insured.)

Proposed Insured:                          Age:
Buyer's signature indicates Buyer's election to obtain the above marked insurance coverage(s) for the term, premium and proposed insured(s) shown.
Signature _Robin T. Leach_            Date _6/16/08_
Signature _____ Date _____
Signature _____ Date _____
Signature _____ Date _____

**SECURITY INTEREST:** Buyer gives Seller a security interest under the applicable certificate of title law and the applicable Uniform Commercial Code in the Manufactured Home and any property added or attached to it, and if indicated above the real property as described, to secure Buyers obligation under this Contract. If this loan is also secured by a Deed of Trust or Mortgage on my real property, then this security agreement is not exclusive. If, and to the extent permitted by applicable law, Buyer agrees that Seller or its assignee may charge and collect from Borrower a reasonable fee for preparing documents related to this transaction, such as applications for certificates of title, financing statements, mortgages and deeds of trust, as well as any amendments to or terminations of any security interests created by any of the foregoing. All rights and remedies under this Note and any Deed of Trust executed herewith are cumulative, but Buyer's right to a written notice of default and 30 days to cure shall not be affected by any inconsistent provision of any Deed of Trust. Buyer also assigns directly to Seller any interest Buyer may have in premium refunds or proceeds under any insurance covering the Manufactured Home. Buyer agrees to execute any application for certificate of title or ownership, financing statement or other document necessary to perfect Sellers security interest in the Manufactured Home. Buyer authorizes Seller to sign Buyer's name to any financing statement or application or other document which may necessary to perfect the security granted by Buyer herein.

**BUYER'S RIGHT TO PREPAY: BUYER MAY PREPAY ANY AMOUNTS DUE UNDER THIS CONTRACT AT ANY TIME WITHOUT PENALTY.** However, pre-paid finance charges (loan fees, points, finders fees or similar charges), if any, will not be refundable. Buyer has the right to make payments at any time before they are due. Unless Buyer directs Seller otherwise in writing, Seller will apply Buyer's prepayments to reduce the next scheduled payment or payments that Buyer owes under this contract. A partial prepayment will not change the due date or monthly payment amounts.

**PROPERTY INSURANCE:** Buyer is required to insure the Manufactured Home against physical damage for the term of the contract at Buyer's expense, subject to Sellers approval. If Buyer purchased and financed the premium(s), the premium is financed over the term of the loan, even though the term of insurance is less than the loan term. The amount of coverage must provide the types and amounts required by Seller. The insurance policy will contain a loss payable clause protecting Seller (as Seller's interest may appear), and provide for at least a 10 day notice of cancellation to Seller. Buyer agrees to provide written proof of such coverage to Seller at Seller's request within 5 days notice. Buyer has the right to choose the person through whom the property insurance is obtained. If Buyer's insurance coverage expires or is canceled prior to payment in full of this contract, Buyer must obtain no less than the minimum coverage at Buyer's expense for the remaining term of the contract. Should Buyer fail to maintain coverage or fail to provide proof of such insurance, Seller may, but is not obligated to, at Seller's sole discretion, obtain coverage in an amount and type it deems necessary. Buyer agrees that such coverage may cover Seller's interest and Buyer's interest or only Seller's interest. Seller may, at its sole option, insure against losses in amounts equal to the unpaid balance due on the note. Buyer understands the insurance premiums may be higher if Seller purchases the insurance than might be the case if

Page 2 (10/00)

Buyer had purchased the insurance. Seller may purchase the insurance from an affiliated company which may receive a profit for this service. Seller has no obligation to Buyer to search for any lower cost premiums that may be available to Buyer by other insurance companies.

**ADVANCES TO PROTECT THE MANUFACTURED HOME:** If Buyer fails to pay for required insurance, if Buyer fails to pay park or lot rent (and any other related charges), if Buyer fails to satisfy taxes, assessments, or other liens or encumbrances against the Manufactured Home, if Buyer fails to keep the Manufactured Home in good repair or if Buyer fails to make any other payments required by this contract or applicable law, Seller may (but is not required to) make such repairs or payments Seller chooses. Any and all of such payments made by Seller, and any amounts Seller pays to protect or enforce Seller's security interest, will be added to the amount Buyer owes Seller on this contract, and will be secured by the Manufactured Home. Buyer agrees to pay interest on these amounts at the Contract Rate provided for in this contract on any such amounts Buyer does not repay immediately. At Seller's sole option, Seller may (1) demand that Buyer repay these amounts immediately, or (2) add these amounts to Buyer's regularly scheduled payments, or (3) add these amounts as additional installments due or (4) add these amounts to the final installment due on this contract.

**DELINQUENCY AND DEFAULT:** Time is of the essence. If a payment is more than 15 days late, Buyer agrees to pay a late charge of 5% of the unpaid amount, not to exceed $5.00. If any check, negotiable instrument of withdrawal or share draft is dishonored and returned to Seller by Buyer's financial institution, Buyer will pay a processing fee of a maximum of $20.00 or the maximum amount permitted by law, whichever is less, in addition to being required to make payment on the item, and late charges. Buyer will be in default on this contract if: (1) Buyer fails to make any payment when due; or (2) otherwise fails to perform any of Buyer's obligations under this contract; or (3) Buyer dies or becomes legally unable to manage Buyer's affairs; or (4) any statement of fact, representation or warranty Buyer makes to Seller in Buyer's loan application, or in any loan document is false, misleading, inaccurate, or incomplete. In the event of Buyer's default, Seller will give Buyer notice of the right to cure the default ("Notice of Default") when required by law. Buyer is not, however, entitled to a Notice of Default more than twice in any one-year period. Under no circumstances is Buyer entitled to a Notice of Default if Buyer has either abandoned or voluntarily surrendered the Manufactured Home, or if other extreme circumstances occur. If Buyer has not cured the default within 30 days after the postmarked date of the notice, Seller may accelerate the maturity of the debt and require Buyer to pay Seller the entire remaining balance due on the contract. Seller may take legal action against Buyer, and Seller may repossess the Manufactured Home. In the event of default, Buyer also agrees to pay Seller's expenses for (a) reasonable attorney's fees, not to exceed 15% of Buyer's unpaid debt, after referral to an attorney who is not Seller's salaried employee; (b) court costs and disbursements; and (c) costs of repossessing the Manufactured Home including the costs of storing, reconditioning, and reselling it. Before Seller sells the Manufactured Home, Buyer can get it back (redeem) if Buyer (1) pays Seller amounts which are past due, including late charges; (2) pays Seller the cost of taking and storing the Manufactured Home and other expenses that Seller incurs; (3) pays Seller all other charges or other expenses to which Seller is entitled under this contract; and (4) cures any other defaults which may have occurred. Buyer's right to redeem will end when the Manufactured Home is sold unless otherwise required by law. Any personal property of Buyer's in or attached to the Manufactured Home which is not subject to Seller's security interest may be held by Seller without liability if the Manufactured Home is repossessed. Buyer will be deemed to have waived any claim thereto unless written demand by certified mail is made upon Seller within ten (10) days after repossession.

**OTHER TERMS AND CONDITIONS:** Buyer will not move the Manufactured Home from the address above without Seller's prior written consent. Buyer will not sell the Manufactured Home without Seller's prior written consent. Buyer will not let the Manufactured Home become part of any real estate. Buyer agrees that the Manufactured Home sold by the terms of this contract is personal property. Unless Seller gives prior written consent, Buyer shall not allow the Manufactured Home to become a part of real estate or to otherwise lose its status as personal property under applicable law, and doing so shall constitute willful and malicious injury to the Manufactured Home and Seller's security interest herein. Buyer will not encumber or abandon the Manufactured Home or use it for hire or illegal activity, nor allow any lot lien, landlord lien, or similar lien to encumber the Manufactured Home. Buyer will pay promptly all taxes and any liens and encumbrances of the Manufactured Home. Buyer will notify Seller promptly of any loss or damage to, or confiscation or theft of the Manufactured Home. When Seller asks for it, Buyer promptly will provide Seller with proof that (1) Buyer has the insurance required under this contract; (2) all taxes assessed against the Manufactured Home have been paid; (3) all park or lot rent (and any other related charges) due has been paid; (4) Seller's lien is the only lien against the Manufactured Home, and (5) the Manufactured Home is in good condition and repair. Seller can inspect the Manufactured Home at any time. If Buyer is married, and residing in a community property state, both Buyer's community property and separate property will be liable for all payments under this contract. Buyer will cooperate with Seller regarding any requests after closing to correct errors made concerning this contract or the transaction and to provide any and all additional documentation deemed necessary by Seller to complete this transaction. Buyer acknowledges that Buyer has examined the Manufactured Home and that, if it is used, Buyer accepts the Manufactured Home as is. The year of the Manufactured Home as specified in this contract is for identification purposes only. Seller may rely on a telecopy or photocopy of this agreement as if it were an original. Buyer acknowledges that any Broker or other third party used to facilitate this transaction may receive compensation from Seller for its services. If the Home Buyer Protection Plan (HBPP) or Credit Life were purchased, the premium(s) are financed over the term of the loan, even though the term of insurance is less then the loan term.

**ARBITRATION:** All disputes, claims or controversies arising from or relating to this contract, or the subject hereof, or the parties, including the enforceability or applicability of this arbitration agreement or provision and any acts, omissions, representations and discussions leading up to this agreement, hereto, including this agreement to arbitrate, shall be resolved by mandatory binding arbitration by one arbitrator selected by Seller with Buyer's consent. This agreement is made pursuant to a transaction in interstate commerce and shall be governed by the Federal Arbitration Act at 9 U.S.C. Section 1. Judgment upon the award rendered may be entered in any court having jurisdiction. The parties agree and understand that they choose arbitration instead of litigation to resolve disputes. The parties understand that they have a right to litigate disputes in court, but that they prefer to resolve their disputes through arbitration, except as provided herein. **THE PARTIES VOLUNTARILY AND KNOWINGLY WAIVE ANY RIGHT THEY HAVE TO A JURY TRIAL.** The parties agree and understand that all disputes arising under case law, statutory law and all other laws including, but not limited to, all contract, tort and property disputes will be subject to binding arbitration in accord with this contract. The parties agree that the arbitrator shall have all powers

Page 3 (10/00)

provided by law, the contract and the agreement of the parties. These powers shall include all legal and equitable remedies including, but not limited to, money damages, declaratory relief and injunctive relief. Notwithstanding anything hereunto the contrary, Seller retains an option to use judicial (filing a lawsuit) or non-judicial relief to enforce a security agreement relating to the Manufactured Home secured in a transaction underlying this arbitration agreement, to enforce the monetary obligation secured by the Manufactured Home or to foreclose on the Manufactured Home. The institution and maintenance of a lawsuit to foreclose upon any collateral, to obtain a monetary judgment or to enforce the security agreement shall not constitute a waiver of the right of any party to compel arbitration regarding any other dispute or remedy subject to arbitration in this contract, including the filing of a counterclaim in a suit brought by Seller pursuant to this provision.

**INFORMATION SHARING:** Seller may investigate Buyer's credit history and credit capacity in connection with opening, updating, modifying, extending, and/or collecting Buyer's account, and share information about Buyer and Buyer's account with credit reporting agencies. Seller may sell or otherwise furnish information about Buyer, including insurance information, to all others who may lawfully receive such information. Seller may furnish specific information about the Manufactured Home and any insurance policies on the Manufactured Home to any insurance agent to enable such agent to quote premiums to Buyer and solicit Buyer's insurance business. Seller may also verify Buyers employment, pay, assets, and debts; and anyone receiving a copy of this contract is hereby authorized to release such information to Seller.

**WAIVER AND MODIFICATION:** Seller's waiver of any default shall not constitute a waiver of any other default. The procurement of required property insurance, or the payment of taxes, or other liens, or other charges, by Seller shall not be a waiver of Seller's right to accelerate the maturity of this contract and declare a default herein.

**WARRANTIES:** Any warranties relating to a new Manufactured Home have been provided to Buyer by Seller, or a warranty company, or the manufacturer in a separate writing, receipt of which Buyer hereby acknowledges. Except as provided in such writing, if any, there are no **warranties, express or implied, including but not limited to warranties of merchantability or fitness for a particular purpose.** Buyer acknowledges that Buyer has examined the Manufactured Home and that, if it is used, Buyer accepts the Manufactured Home "as is". The year of the Manufactured Home is for identification purposes only. Except to the intent expressly stated herein, or as otherwise required by law, no assignee of this contract shall be liable, either in tort or contract, for any direct or indirect damages or for any special, incidental, or consequential damages arising out of or in connection with this contract or transaction. This disclaimer of warranties does not affect service contracts made with the Seller within 90 days from the date of this contract.

**VALIDITY:** Wherever possible each provision of this contract shall be interpreted in such a manner as to be effective and valid under applicable law, but if any provision of this contract shall be prohibited by or be invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this contract. The contract shall be governed both as to issues of formation and performance, by the laws of the State where the contract was executed by Buyer, provided that to the extent Federal preemption applies, Federal rights and remedies will be applied. This contract shall be of no effect until and unless signed by Buyer and Seller. In no event shall any charge under this contract exceed the highest amount allowed by applicable law. If any excess charge is received such excess shall be refunded or applied to the amount due.

**ASSIGNMENT:** Seller may assign this contract to any person or entity. All rights granted to Seller under this contract shall apply to any assignee of this contract.

**ENTIRE AGREEMENT:** This contract, any separate written warranty and the "Retailer Closing Agreement" constitute the entire agreement between Buyer and Seller. Buyer agrees that no representations, oral or written, have been made to Buyer to induce Buyer to enter into this contract, other than the representations expressly set forth in this contract and in any separate written warranty.

**GUARANTY:** Co-Signer agrees that all amounts owed under this contract will be paid when due. Co-Signer will still be obligated even if Buyer is released or if Seller waives or delays enforcement of any of Seller's rights under this contract. Seller does not have to give Co-Signer notice of any such waiver, delay or release. See attached Notice to Co-Signer before signing this guaranty.

7

**NOTICE TO THE BUYER:** 1. DO NOT SIGN THIS DOCUMENT BEFORE YOU READ IT OR IF IT CONTAINS ANY BLANK SPACES. 2. YOU ARE ENTITLED TO AN EXACT COPY OF THE DOCUMENT YOU SIGN, KEEP IT TO PROTECT YOUR LEGAL RIGHTS. 3. LIABILITY INSURANCE COVERAGE FOR BODILY INJURY AND PROPERTY DAMAGE CAUSED TO OTHERS IS NOT INCLUDED UNLESS MOBILOWNERS INSURANCE IS INDICATED IN THE PROPERTY INSURANCE BOX ABOVE. 4. CAUTION: YOU ACKNOWLEDGE RECEIPT OF A COMPLETED COPY OF THIS RETAIL INSTALLMENT CONTRACT CONSISTING OF FIVE (5) PAGES.

**SELLERS AGREEMENT:** Seller agrees to this contract, and subject to acceptance by Vanderbilt Mortgage and Finance, Inc. at its designated office, assigns it to Vanderbilt Mortgage and Finance, Inc. in accordance with the assignment set forth herein. Notice of acceptance is hereby waived.

Seller    FREEDOM HOMES MERIDIAN, MS

_____    _____
(Signature)              (Title)

Seller's Address    2701 S FRONTAGE RD I-55
MERIDIAN, MS
(City)              (State)

Date of this Contract _____6-16-08_____

**CAUTION — IT IS IMPORTANT THAT YOU THOROUGHLY READ THE CONTRACT BEFORE YOU SIGN IT.**

Robin T. Leach
(Buyer)                    ROBIN T LEACH

6/16/08
(Date)

_____
(Buyer)

_____
(Date)

**GUARANTY OF BUYER'S PROMISES:** The undersigned, separately and together, agree(s) to pay all amounts due on this contract until all amounts due on this contract are paid in full. The undersigned also agree(s) to all the terms and conditions of this contract.

_____
(Co-Signer)

_____
(Date)

_____
(Co-Signer)

_____
(Date)

## NOTICE

**ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR (BUYER) COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR (BUYER) SHALL NOT EXCEED AMOUNT PAID BY THE DEBTOR (BUYER) HEREUNDER.**

(See above for Buyer's and Seller's Signatures)

## ASSIGNMENT BY SELLER

TO VANDERBILT MORTGAGE AND FINANCE, INC. (VANDERBILT): For value received, Seller hereby assigns within contract and all Seller's right, title and interest in it, and its collateral to Vanderbilt Mortgage and Finance, Inc. (Assignee), together with certain warranties and recourse obligations, if any, contained in the underlying agreement between Seller and Vanderbilt.

VANDERBILT MORTGAGE AND FINANCE, INC. assigns _____

the foregoing contract including all amounts payable by buyer and the security interest in the collateral, without recourse.

Date_____    By:_____    Title:_____

MS Fixed Land/Home - Rev 10/2000

4



**VANDERBILT MORTGAGE AND FINANCE, INC.**
P.O. BOX 9800, MARYVILLE, TN 37802 • (865) 380-3000 (800) 970-7250

*INITIAL* ESCROW ACCOUNT DISCLOSURE STATEMENT

THIS IS AN ESTIMATE OF ACTIVITY IN YOUR ESCROW ACCOUNT DURING THE COMING YEAR BASED ON PAYMENTS
ANTICIPATED TO BE MADE FROM YOUR ACCOUNT.

| Period | Payments to Escrow Account | Payments from Escrow Account | Description | Escrow Account Balance |
|--------|----------|----------|-------------|---------|
| Initial Deposit | | | | $.00 |
| | $98.33 | | | $98.33 |
| 1 | $98.33 | | | $196.66 |
| 2 | $98.33 | | | $294.99 |
| 3 | $98.33 | | | $393.32 |
| 4 | $98.33 | | | $491.65 |
| 5 | $98.33 | | | $589.98 |
| 6 | $98.33 | | | $688.31 |
| 7 | $98.33 | | | $786.64 |
| 8 | $98.33 | | | $884.97 |
| 9 | $98.33 | | | $983.30 |
| 10 | $98.33 | | | $1,081.63 |
| 11 | $98.33 | | | $.04 |
| 12 | $98.33 | $1,180.00 | Insurance | |

(PLEASE KEEP THIS STATEMENT FOR COMPARISON WITH THE ACTUAL ACTIVITY IN YOUR ACCOUNT AT THE END
OF THE ESCROW ACCOUNTING COMPUTATION YEAR.)

Cushion selected by servicer:    $196.67

YOUR MONTHLY MORTGAGE PAYMENT FOR THE COMING YEAR WILL BE $640.95 OF WHICH $542.62 WILL BE FOR
PRINCIPAL AND INTEREST AND $98.33 WILL GO INTO YOUR ESCROW ACCOUNT.

The escrow account continues during the life of the loan.

Dated _6/16/08_ _____

Witness _Charles E Horn_____    Borrower: (_Robin Leach_)
                                         (Signature of ROBIN T LEACH )

                                         _____
                                         (Signature of)

INITIAL ESCROW ACCOUNT DISCLOSURE STATEMENT - REV. 02/1999
Page 1

After Recording Return To:
Vanderbilt Mortgage
500 Alcoa Trail
Maryville, TN 37804

MORT    VD    550
Recorded In Above Book and Page
06/23/2008 12:58:45 PM
Bot Merchant
Chancery Clerk
Leake County, MS

_____ [Space Above This Line For Recording Data] _____

# DEED OF TRUST

## DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in
Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document
are also provided in Section 16.

(A) **"Security Instrument"** means this document, which is dated _6|16|08_ _____,
_____, together with all Riders to this document.
(B) **"Borrower"** is Robin T Leach + Willie D. Leach _____. Borrower is
the trustor under this Security Instrument.
(C) **"Lender"** is Vanderbilt Mortgage and Finance Inc. Lender is a Tennessee corporation
organized and existing under the laws of Tennessee. Lender's address is 5000 Clayton Rd Maryville
TN 37804. Lender is the beneficiary under this Security Instrument.
(D) **"Trustee"** is First American Title _____
(E) **"Note"** means the promissory note signed by Borrower and dated _____ of even date _____,
_____. The Note states that Borrower owes Lender seventy two thousand two hundred twenty seven and 61/100
Dollars (U.S. $ 72,227.61 _____) plus interest. Borrower has promised to pay this debt in
regular Periodic Payments and to pay the debt in full not later than _7/01/2038_ _____.
(F) **"Property"** means the property that is described below under the heading "Transfer of Rights
in the Property."
(G) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late
charges due under the Note, and all sums due under this Security Instrument, plus interest.
(H) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The
following Riders are to be executed by Borrower [check box as applicable]:

| | | | | | |
|---|---|---|---|---|---|
| ☐ | Adjustable Rate Rider | ☐ | Condominium Rider | ☐ | Second Home Rider |
| ☐ | Balloon Rider | ☐ | Planned Unit Development Rider | ☐ | Other(s) [specify]_____ |
| ☐ | 1-4 Family Rider | ☐ | Biweekly Payment Rider | ☑ | Manufactured Home |

(I) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations,
ordinances and administrative rules and orders (that have the effect of law) as well as all applicable
final, non-appealable judicial opinions.

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3025   1/01 *(page 1 of 16 pages)*



MORT   VD   551

(J) "**Community Association Dues, Fees, and Assessments**" means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(K) "**Electronic Funds Transfer**" means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(L) "**Escrow Items**" means those items that are described in Section 3.

(M) "**Miscellaneous Proceeds**" means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(N) "**Mortgage Insurance**" means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(O) "**Periodic Payment**" means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(P) "**RESPA**" means the Real Estate Settlement Procedures Act (12 U.S.C. §2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(Q) "**Successor in Interest of Borrower**" means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY

This Security Instrument secures to Lender:  (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note.

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3025   1/01 *(page 2 of 16 pages)*



MORT    VD   552

For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the County of

_____ Leake _____ : See Attached Exhibit A
[Name of Recording Jurisdiction]

which currently has the address of _____ *515* _____ Purvis Road _____
[Street] *39189*
*Walnut Grove* Sebastopol ____, Mississippi 39359 ("Property Address"):
[City] [Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:
1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order;

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3025   1/01   *(page 3 of 16 pages)*



5

MORT   VD   553

(c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

**2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

**3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any,

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3025   1/01   *(page 4 of 16 pages)*



MORT    VD    554

be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3025   1/01   *(page 5 of 16 pages)*

MORT   VD   555

**4.  Charges; Liens.**  Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any.  To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument.  If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien.  Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5.  Property Insurance.**  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance.  This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires.  What Lender requires pursuant to the preceding sentences can change during the term of the Loan.  The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.  Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense.  Lender is under no obligation to purchase any particular type or amount of coverage.  Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect.  Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained.  Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument.  These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

MISSISSIPPI–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3025   1/01  *(page 6 of 16 pages)*



MORT `` VD   556

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3025   1/01   *(page 7 of 16 pages)*



MORT    VD   557

on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3025    1/01  *(page 8 of 16 pages)*



- MORT   VD   558

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3025   1/01  *(page 9 of 16 pages)*



(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has – if any – with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. **Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT         Form 3025   1/01  *(page 10 of 16 pages)*



12

MORT    VD    560

damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT       Form 3025   1/01   (page 11 of 16 pages)



MORT    VD   561

Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

MISSISSIPPI–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3025   1/01 *(page 12 of 16 pages)*



**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT          Form 3025  1/01  (page 13 of 16 pages)



· MORT   VD   563

of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. **Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3025   1/01  *(page 14 of 16 pages)*



16

'MORT   VD   564

NON-UNIFORM COVENANTS.  Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies.  Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise).  The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale.  If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law.  Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give Borrower, in the manner provided in Section 15, notice of Lender's election to sell the Property.  Trustee shall give notice of sale by public advertisement for the time and in the manner prescribed by Applicable Law.  Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at such time and place in _____Leake_____ County as Trustee designates in the notice of sale in one or more parcels and in any order Trustee determines. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied.  The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein.  Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release.  Upon payment of all sums secured by this Security Instrument, Lender shall cancel this Security Instrument.  If Trustee is requested to cancel this Security Instrument, all notes evidencing debt secured by this Security Instrument shall be surrendered to Trustee.  Borrower shall pay any recordation costs.   Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee.  Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder by an instrument recorded in the county in which this Security Instrument is recorded.  Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT     Form 3025  1/01 *(page 15 of 16 pages)*



MORT   VD   565

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

Witnesses:

_____   _Robin T. Leach_____ (Seal)
                                                          - Borrower

_____   _Willie D Leach_____ (Seal)
                          Willie D Leach              - Borrower

_____ [Space Below This Line for Acknowledgment] _____

STATE OF MISSISSIPPI,   _Newton_   County ss:

On this _16th_ day of _June, 2008_, personally appeared before me, the undersigned authority in and for said County and State, the within named

_Robin T. Leach + Willie D. Leach_

Who acknowledged that he/she/they signed and delivered the foregoing instrument on the day and year therein mentioned.

Given under my hand and seal of office.

My Commission Expires:

(Seal)

_Charles E Horne_
Notary Public

MISSISSIPPI--Single Family--Fannie Mae/Freddie Mac UNIFORM INSTRUMENT        Form 3025   1/01 (page 16 of 16 pages)

MORT    VD    566

# EXHIBIT "A"

A certain parcel of land located in the Southwest Quarter of the Southwest Quarter of Section 23, Township 9 North, Range 9 East, Leake County, Mississippi, and being more particularly described as follows:

Commencing at a fence corner post on the West margin of Arbor Road; said corner identified as marking the apparent Northeast corner of the Southwest Quarter of the Southwest Quarter of Section 23, Township 9 North, Range 9 East, Leake County, Mississippi; Run thence S 37°14'05" W-449.84 feet to a ½" rebar found and the point of beginning, thence S 50°02'34" W-471.90 feet to a ½" rebar found; thence N 39°08'13" W along the Northerly margin of Purvis Road for 91.38 feet to a ½" rebar set; thence N 41°44'34" W along said road for 44.35 feet to a ½" rebar found; thence N 18°26'50" E-52.10 feet to a ½" rebar found; thence N 00°16'54" E along an in-place fence for 175.01 feet to a ½" rebar set at a fence corner and hereinafter referred to as Point "A"; thence S 86°38'25" E-432.32 feet to the point of beginning.

Containing 1.82 acres.

Also an ingress-egress easement, being 30.0 feet in width, crossing said parcel and described as follows:

Commencing at the aforementioned Point "A"; run thence S 86°38'25" E-15.02 feet to the point of beginning; run thence along the centerline of said easement S 00°16'54" W-176.60 feet; thence S 18°26'50" W-63.09 feet to a terminal point on the Northerly margin of Purvis Road.

Containing 0.17 acres.

INDEXING INSTRUCTIONS: SW ¼ of SW ¼, S23, T9N, R9E, Leake Co., MS



**VANDERBILT MORTGAGE AND FINANCE, INC.**
P.O. BOX 9800, MARYVILLE, TN 37802
865.380.3000 -- 800.970.7250

## ESCROW AGREEMENT

In connection with your loan from Vanderbilt Mortgage and Finance, Inc. ("we" or "us"), you agree to pay to us on the day which periodic payments of principal and interest are due, and until your loan is paid in full, a sum (the "Funds" or "Escrow Payments," and subject to modification under the following paragraph) to provide for the payment of premiums to insure the manufactured or modular home against physical damage, including flood insurance if applicable ("Physical Damage Insurance" and "Escrow Items"). We may, at any time, collect and hold the Funds in an amount sufficient to permit us to apply the Funds, as may be required by law, and not to exceed the maximum amount a lender can require under law. We will estimate the amount of such funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

In the event you fail to pay taxes, assessments, charges, fines and impositions attributable to the manufactured or modular home or real property which can attain priority over our security interest or lien as a lien or encumbrance on such, we may, at our option, require you to make payments to us, as an additional Escrow Item, additional Funds sufficient to permit us to apply the Funds for such purposes, as may be required by law, and not to exceed the maximum amount a lender can require under law.

Funds shall be held by us in an institution whose deposits are insured by a federal agency, instrumentality, or entity or in any Federal Home Loan Bank. We will apply the Funds to pay Escrow Items no later than the time specified by law. We will not charge you for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless we pay you interest on the Funds and applicable law permits us to make such a charge. Unless applicable law requires interest to be paid on the Funds, we will not be required to pay you any interest or earnings on the Funds. We shall provide you, without charge, an annual accounting of the Funds as required by law.

If there is a surplus of Funds held in escrow, as defined by law, we shall account to you for the excess funds in accordance with law. If there is a shortage of Funds held in escrow, as defined by law, we shall notify you as may be required by law, and you shall pay to us the amount necessary to make up the shortage in accordance with law. Upon payment in full of all obligations due under your loan, we will promptly refund to you any Funds then held by us.

*Initial Escrow Payments.* Beginning with your payment of principal and interest due <u>8/01/2008</u> , Escrow Payments are due as follows:

    [X] If your loan is repayable monthly: <u>$98.33</u> (1/12th of the annual premium)

    [ ] If your loan is repayable bi-weekly: <u>$.00</u> (1/26th of the annual premium)

---

TOTAL PAYMENT <u>$640.95</u>, INCLUDES PRINCIPAL, INTEREST
AND PHYSICAL DAMAGE INSURANCE ESCROW.

---

*Robin T. Leach*  6/16/08

| | |
|---|---|
| (Signature) Date | (Signature) Date |

ROBIN T LEACH

■■■■

Record & Return by [  | Mail |  ) Pickup to:

CMH Homes, Inc.
5000 Clayton Road
Maryville, Tennessee 37804

MORT    VD    567

This Instrument Prepared By:

_____
_____
_____

## MANUFACTURED HOME RIDER TO SECURITY INSTRUMENT

This Rider is made this 16th day of June , 20 08 and is incorporated into and amends and supplements the Mortgage, Deed of Trust or Security Deed ("Security Instrument") of the same date given by the undersigned ("Buyer/Borrower") to secure Buyer/Borrower's payments and obligations under that certain manufactured home retail installment contract and disclosure statement or manufactured home promissory note, security agreement and disclosure statement with CMH HOMES, INC. ("Seller"), VANDERBILT MORTGAGE AND FINANCE, INC. ("Assignee") (and each severally and jointly the "Seller" herein, regardless of how denominated in the Security Instrument), and the Buyer/Borrower (the "Contract") of the same date as the Contract, and being secured by the real property described in the Security Instrument ("Property").

Buyer/Borrower agrees that the Security Instrument is amended and supplemented as follows:

**1. Rider Controlling.** IF THERE IS A CONFLICT BETWEEN THE PROVISIONS OF THIS RIDER AND THOSE IN THE SECURITY INSTRUMENT, THE PROVISIONS IN THIS RIDER SHALL CONTROL. SUCH CONFLICTING PROVISIONS IN THE SECURITY INSTRUMENT SHALL BE DEEMED INEFFECTIVE OR MODIFIED AS NECESSARY TO MAKE SUCH CONFLICTING PROVISIONS CONSISTENT WITH THE PROVISIONS OF THIS RIDER.

**2. Treatment of Manufactured Home.** The Buyer/Borrower agrees (as marked and initialed by Buyer/Borrower) that the following described Manufactured Home, which is or will be sited on the Property, will have the following character:

(a) Manufactured Home Is and Remains Personal Property.      [ X ]      (Buyer/Borrower Initials) *RTL , WL*

If this Section 2(a) is marked and initialed, the Manufactured Home shall retain its character as personal property and shall not become or be considered to be part of the Property, and shall be regulated by the provisions of the Contract pursuant to which Buyer/Borrower has granted Seller a personal property security interest in the Manufactured Home.

(b) Manufactured Home Is Real Property.      {  }      (Buyer/Borrower Initials): _____

If this Section 2(b) is marked and initialed, the Manufactured Home shall be considered an improvement to the Property and thereby become a part of the Property. The term "Property" herein and in the Security Instrument shall be inclusive of the Manufactured Home.

Page 1
MH_Rider to Various Forms of Mts/DT's - Univ /tvoe2-All MHR8/353

Revised 11/27/2006 ■■■■

*RTL
WL*

MORT   VD   568

### (Description of Manufactured Home)

Make: <u>CMH</u>                Year: <u>2007</u>                Model: <u>LAKESHORE</u>

Serial Number(s): <u>CS20089581NAB</u> (the "Manufactured Home" herein)

**3. Covenants and Agreements of Borrower as to Manufactured Home.** If Section 2(a) has been marked and initialed, the Buyer/Borrower covenants and confirms that the Manufactured Home is and shall remain personal property, separate and severable from the Property, and Buyer/Borrower agrees not to take any action, or fail to take any action, the consequence of which would be to change the status of the Manufactured Home from personal property, provided that the Buyer/Borrower may treat the Manufactured Home as real property for ad valorem and similar tax purposes if such treatment is permissible under state law notwithstanding that the Manufactured Home is personal property otherwise and such tax treatment does not otherwise affect or negate the treatment of the Manufactured Home as personal property.

Buyer/Borrower agrees that Seller shall have the following rights and remedies in the event Seller commences proceedings for the foreclosure and sale of the Property: (a) After Seller repossesses or recovers the Manufactured Home, Seller may sell the Manufactured Home and apply the net sale proceeds (after having deducted the fees and costs permitted under the Contract and applicable law) toward any remaining amount Buyer/Borrower owes under the Contract. (b) In the event of any foreclosure sale of the Property, the Manufactured Home may, at Seller's election, be sold with the Property as a whole or sold separately. It shall not be necessary to have the Manufactured Home present at the place of sale of the Property. (c) Seller may exercise it rights and remedies relative to the Manufactured Home and Property in such order or manner as Seller may elect.

**4. Borrower Covenants and Agreements When Manufactured Home Converted to Real Property.** If Section 2(b) has been marked and initialed, Buyer/Borrower covenants and agrees that the Manufactured Home is or will be an improvement to the Property, and thus be or become a part of the Property. Additionally, Buyer/Borrower agrees and covenants (to the extent such is not now the case): to affix, and keep so affixed, the Manufactured Home to a permanent foundation; to comply with all applicable law otherwise relating to the affixation of the Manufactured Home; to remove the wheels, axles, tow bar and hitch, as may be applicable; that the Manufactured Home's being affixed to the Property does not and will not violate any zoning laws or restrictive covenants relating to the Property; to surrender the certificate of title to the Manufactured Home, if required by Seller and permitted by applicable law, to obtain any and all requisite governmental approvals and documentation necessary for the Manufactured Home to be treated as real property under applicable law and to comply with Seller's reasonable requests in connection therewith; and not to take such action or refrain from taking such action, the consequence of which would be to change the status of the Manufactured Home from real property status to personal property status under applicable law.

By signing below, Buyer/Borrower accepts and agrees to the terms and covenants contained in this Rider.

*Robin T. Leach*                (Seal)          *Karla E Horne* (Seal)
Borrower                                         Witness

ROBIN T LEACH                                    *Charles E. Horne*
Printed Name                                     Printed Name

*Willie D Leach*                (Seal)          *Charles Horne* (Seal)
Borrower  Willie D. Leach                        Witness

Printed Name                                     Charles E. Horne
                                                 Printed Name

# CERTIFICATE OF TITLE

Form:79-001-05-7-1-000

## STATE OF MISSISSIPPI

**ORIGINAL**

| VEHICLE IDENTIFICATION NUMBER | MAKE | YEAR | MODEL | BODY | TITLE NUMBER |
|---|---|---|---|---|---|
| CS2008958TNAB | CMH | 2007 | 37L | MM | E949150-01 |

| TITLE DATE | DATE OF FIRST SALE FOR USE NEW ONLY | NO. CYL. | NEW / USED | TYPE OF VEHICLE | PASS. OR GVW |
|---|---|---|---|---|---|
| 06272008 | 06162008 | 00 | X | MMH | 000 |

ODOMETER - TENTHS NOT INCLUDED

000000

MANUFACTURED HOME

OWNER
LEACH ROBIN T
515 PURVIS ROAD
WALNUT GROVE    MS 39189

1ST LIENHOLDER (OR OWNER IF NO LIEN)
VANDERBILT MORTGAGE FIN INC
P O BOX 4007
MARYVILLE    TN 37802

DATE:

MONTH   DAY   YEAR
06/16/2008

2ND LIENHOLDER

DATE:

MONTH   DAY   YEAR

LIEN SATISFACTION: THE UNDERSIGNED HOLDER OF ABOVE DESCRIBED LIEN(S) ON THE MOTOR VEHICLE DESCRIBED HEREON HEREBY ACKNOWLEDGES SATISFACTION THEREOF.

1ST LIEN _____ BY _____
         (LIENHOLDER)                         (SIGNATURE AND TITLE)
THIS _____ DAY OF _____ 20 ____

2ND LIEN _____ BY _____
         (LIENHOLDER)                         (SIGNATURE AND TITLE)
THIS _____ DAY OF _____ 20 ____



IN WITNESS WHEREOF I HAVE HEREUNTO SET MY HAND THIS
THE   27  DAY OF  JUNE   20 08
08178056042              02305

CONTROL NUMBER
15993704

STATE TAX COMMISSION

The Mississippi State Tax Commission hereby certifies that on application duly made, the person named herein is registered by this office, as the lawful owner of the vehicle described subject to the liens or security interests as may subsequently be filed with the State Tax Commission. This certificate of title is issued pursuant to the Mississippi Motor Vehicle Title Law Section 63-21-1, Mississippi Code of 1972, and subject to the provisions thereof.

**VOID IF ALTERED**

B 8 (Official Form 8) (12/08)

**UNITED STATES BANKRUPTCY COURT**
**Southern District of Mississippi**

In re _____**Robin T. Leach**_____   Case No. __**11-00427**_____
Debtor                                                                                          Chapter 7

# CHAPTER 7 INDIVIDUAL DEBTOR'S STATEMENT OF INTENTION

**PART A** – Debts secured by property of the estate. *(Part A must be fully completed for **EACH** debt which is secured by property of the estate. Attach additional pages if necessary.)*

| Property No. 1 | |
|---|---|
| **Creditor's Name:**<br>**City County Credit Union** | **Describe Property Securing Debt:**<br>credit union loan |

Property will be *(check one)*:
☑ Surrendered          ☐ Retained

If retaining the property, I intend to *(check at least one)*:
☐ Redeem the property
☐ Reaffirm the debt
☐ Other. Explain _____ (for example, avoid lien using 11 U.S.C. § 522(f))

Property is *(check one)*:
☐ Claimed as exempt          ☑ Not claimed as exempt

| Property No. 2 | |
|---|---|
| **Creditor's Name:**<br>**The Citizens Bank** | **Describe Property Securing Debt:**<br>**2003 Volkswagon Passat** |

Property will be *(check one)*:
☐ Surrendered          ☑ Retained

If retaining the property, I intend to *(check at least one)*:
☐ Redeem the property
☑ Reaffirm the debt
☐ Other. Explain _____ (for example, avoid lien using 11 U.S.C. § 522(f))

Property is *(check one)*:
☐ Claimed as exempt          ☑ Not claimed as exempt

B 8 (Official Form 8) (12/08)                                                                                                  Page 2

| Property No. 3 | |
|---|---|
| **Creditor's Name:**<br>**Vanderbilt Mortgage** | **Describe Property Securing Debt:**<br>**1.8 acre homestead land & 2007 Clayton Mobile Home** |

Property will be *(check one)*:
- ☑ Surrendered          ☐ Retained

If retaining the property, I intend to *(check at least one)*:
- ☐ Redeem the property
- ☐ Reaffirm the debt
- ☐ Other.  Explain _____ (for example, avoid lien using 11 U.S.C. § 522(f))

Property is *(check one)*:
- ☐ Claimed as exempt                    ☑ Not claimed as exempt

---

**PART B** – Personal property subject to unexpired leases. *(All three columns of Part B must be completed for each unexpired lease. Attach additional pages if necessary.)*

| Property No. 1 | | |
|---|---|---|
| **Lessor's Name:**<br>**None** | **Describe Leased Property:** | Lease will be Assumed pursuant to 11 U.S.C. § 365(p)(2):<br>☐ YES          ☐ NO |

___0___  continuation sheets attached *(if any)*

**I declare under penalty of perjury that the above indicates my intention as to any property of my estate securing a debt and/or personal property subject to an unexpired lease.**

Date: **2/8/2011** _____

s/ **Robin T. Leach** _____
**Robin T. Leach**
Signature of Debtor